Case number 22-3204 and 22-3225, Richard Campfield et al. v. Safelite Group Inc. et al. Argument not to exceed 15 minutes per side. Mr. Olson, you may proceed. May it please the Court, my name is Kurt Olson. I represent the appellant, Richard Campfield, or appellants and Ultrabond, and Cross and Lee in this matter. I've reserved five minutes for rebuttal. As we stated in our opening brief, this case is a classic rendition of David v. Goliath, played out in the vehicle glass repair and replacement industry, which the acronym is VGRR. There are three issues in this proceeding upon appeal. The first issue is whether the District Court misapplied Lexmark in ruling that Ultrabond failed to present adequate evidence to raise a question for a jury on the issue of proximate cause. The second issue is whether the Court misapplied this Court's decision in Grubbs v. Sheekley Group in ruling that certain statements in its broad spectrum marketing campaign, which were all the same, certain statements were not commercial advertising or promotion in accordance with Grubbs. The third issue is whether Safelite's counterclaims plead all the necessary elements, or that they can prove all the necessary elements of the six or seven claims that they have pled against our client. With respect to proximate cause, the seminal case, of course, is Lexmark. The Supreme Court in that case held that a plaintiff suing under the Lanham Act, Section 1125A, regarding false advertising, quote, ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising, and that occurs when the deception of consumers causes them to withhold trade from the plaintiff. Recently, the Second Circuit, and we submitted this, Your Honors, yesterday for supplemental authority, the Second Circuit in Sousa, in interpreting Lexmark, addressed the question of whether Lexmark abrogated their previous decisions on proximate cause. And the Second Circuit explicitly stated that not only did it not abrogate their prior decisions, it reinforced their decisions on proximate cause. So Lexmark does not set forth some new, different standard on proximate cause. The traditional principles still apply. I guess for me the question here is whether you have enough evidence to survive summary judgment to show economic or reputational injury. You have declarations of various shops. You have your damages expert. What exactly are you pointing to to say that your client has documented economic or reputational injury? First, Your Honor, the evidence shows that SafeLight directly targeted long crack repair, which is the repair of windshield cracks longer than six inches. It's in the documents. There are memos. were passed, which SafeLight and Mr. Campfield were part of that committee, that SafeLight set out to the attack on long crack repair, they referred to it, and it said it cannot be about safety because that's not an issue. So they directly focused on that. Mr. Campfield is a leader in this industry in terms of the evidence that we presented. We presented a consumer survey that showed that 24.5 to 30.5 percent of consumers, but for the misrepresentation, no other intervening factor but for the misrepresentations, would choose long crack repair. So there's no question on that. But there's nothing in that survey saying they would choose your client to perform the long crack repair, is there? Not in that survey, Your Honor. But what it does show is that the district court ruled that a consumer might have a number of intervening factors in the decision to do long crack repair. That survey proves that on that percentage, there were no intervening factors. It was exclusively the misrepresentation. What our client showed, because he has hundreds of customers, several hundred customers, nine of whom came forward and testified that because of Safe Flight's misrepresentations, they lost business for long crack repair that had even been scheduled. I mean, which particular declaration are you pointing to? Dale Scott. Who? Dale Scott, Your Honor. And that's a one-to-one relationship because Mr. Scott is the only, the evidence showed that he was the only repair facility operating in Alaska. So nobody else in Alaska is performing long crack repair. And he was using the repair material that your client is involved in supplying. Is that right? Correct, Your Honor. We also showed that Mr. Camfield, in the evidence, had 50% of the market, according to Mr. McLean, Justin McLean, the financial expert. We also, there's another thing, because the district court ignored that there's three opportunities here. There are the sales from Mr. Camfield, who operates his own business, that he lost himself because of the misrepresentation to consumers. There are the sales from Mr. Camfield and Ultrabond to the commercial customers who were misled, and he lost that opportunity. And there are a third, the sales of product to commercial customers that came forward and testified, who in turn lost the opportunity because of SafeLight's misrepresentations. That is perfectly consistent with Lexmark's admonishment of flowing directly. And in fact, so in a non-comparative claim, this is even stronger. So in Lexmark, there were two issues. The static control made two allegations. Excuse me, I'm sorry. I'm looking at Mr. Scott's statement. The only thing I see where he talks about loss is he says in paragraph 14, I believe my lawn crack repair business is definitely being affected by SafeLight's misleading advertising about the six-inch rule. Is there anything else in that declaration where he talks about any loss or impact on his business? All these declarants were deposed, Your Honor. And in our opening brief, we cite the deposition transcript where he explicated on that. And he said expressly that quite a few customers, he had lost opportunities because they had talked to SafeLight. They had been told that you can't do lawn crack repair or it was not safe. So it's not just the declarations that are in evidence, but as we cited in our opening brief, there are the follow-on deposition transcripts. And these are all cited in your opening brief? Yes, Your Honor. Okay. We also have the... You really have two tiers of claims. One is that as the supplier of the product, your supplies that are sent would be bought by other commercial entities are not being bought. And secondly, your Mr. Canfield himself has a business which is losing. Yes, which lost business as a result of these misrepresentations. What documentation does he have of lost business to himself? It's in his... Well, Your Honor, I think in terms of lost business of himself, that would be based on the lost opportunity because of the consumer survey which showed that more customers... So SafeLight and Mr. Canfield compete directly in Grand Junction as Mr. McLean testified or put in his declaration. So the consumer survey for that market would show Mr. Canfield was injured by virtue of the but-for analysis. Was this a national survey? Yes, Your Honor. It was an expert report. It is part of the record available for Your Honors to view. And there was no... The defendants, SafeLight tried to dowel bear Mr. Burford and the court denied that. So that's the issue in terms of the proximate cause issue. The other decision we're appealing on from the district court is whether two specific channels of statements, because the statements are the same across the board. SafeLight either says that long crack repair cannot be done and a windshield must be replaced if the crack is longer than six inches, or they say that cracks up to six inches can be repaired, implying that anything above that cannot be repaired. And those are the type one, type two statements that the district court, the convention applied there. SafeLight... that they will not repair over six inches, even if it could be done. They're just not doing it. I mean, how is that deceptive to tell a customer we're just not going to repair it? And that would not be, Your Honor, but that's not what they do. They state as an objective fact that it's not repairable, not that it's our policy. And we briefed this in both the opening and the third brief. So in SafeLight, actually, the testimony of their 30B6 witness and the evidence shows that SafeLight, because of its market power, its perceived expertise sets the objective standard for windshield crack repair, which is they say it's six inches, even though the industry, including SafeLight in 2007, reaffirmed in 2014, said up to 14 inches is repairable. That's a set standard that the industry approved and also certified by the American National Standards Institute. So there's no basis, and the evidence in the record shows that there's no basis for the six-inch rule. It's simply there. But what it does do, because SafeLight makes all of its money on replacements, not repair. Your red light is on. So we'll rely on your briefs for your other points. Thank you. May it please the Court, Matt Karas for the SafeLight defendants. I'll just turn straight to proximate cause, because that's the dispositive issue for all of these issues that are being discussed here. Lexmark requires a showing of harm. That's the fifth element. The survey that was referenced, Mr. Biefert's survey, the case law says that that kind of evidence goes to deception, whether or not there's deception. If consumers are deceived, that doesn't solve the proximate cause issue. Lexmark is very clear that in order to proceed, every plaintiff must show harm. So what do we have here that's an attempt to show harm? We have the declarations, and we have what was referenced to be Mr. Canfield's own business. With respect to the declarations, there's nothing in those declarations that is a statement of lost business. First off, it's by distributors. It's not the one-to-one situation that we had in Lexmark. But why couldn't the distributor's loss of business then translate back to Canfield and the plaintiff as the supplier? It is possible if there is a one-to-one circumstance that was described in Lexmark where there are other potential causes where you have this intermediary purchaser, like those commercial customers are. Lexmark was very, very careful to say in this unique circumstance where by definition every loss to a commercial customer would apply to the ultimate plaintiff, then maybe we'll let you proceed. That's not the case here. Those declarants testified themselves that there were other causes for lost business. They weren't part of the network. They didn't do advertising. Multiple causes that did not exist in Lexmark. But they didn't even say, I lost business because of the dollar bill rule. What they said was, if there was no dollar bill rule, and if a customer wanted a repair, and if those customers chose me, and if they chose me enough that I would buy more product, then I would have lost business. That is speculation on top of supposition on top of guesswork, and exactly what Lexmark did not permit. Your opponent in the oral argument is relying on deposition testimony. How would you address that? That is what those declarants expounded on just that idea in their depositions. It's not just the declaration. They testified in their depositions that it was a kind of, if consumer demand increased, then I would have business. Mr. Scott said, I absolutely believe that customer demand would increase, and I would be pursuing more of the business. He didn't even say he was pursuing the market. That was his testimony at deposition. But what is extraordinary to me is that none of those declarants tied any of this to commercial speech. Each one of them said that if they lost a customer, it was because of their insurance policies. Mr. Fleet said all of his consumer business involves insurance claims. That's R1525 at page 94. And he said none of the insurance companies I work with permit long crack repair. Mr. Bray, 132-2 at page 77, said when a customer calls in for their claim, their insurance won't pay for it. Mr. Scott, again, 132-17 at page 95, said it starts with insurance because it would not be paid for by their insurance. So what we have here is Safe Flight explaining to insurance customers the insurance policies. And those insurance policies do not permit long crack repair. And so Safe Flight says you cannot fix a long crack because you can't. Under the policy, that's not advertising. That's acting as a third-party administrator for an insurance company and describing what's in those insurance policies. It seems interesting that Safe Flight, who according to at least the allegations of your opponent, makes the most money on replacements, would be telling the insurance companies as a third-party administrator, you should not repair if it's more than the dollar bill length, you should replace. And therefore, according to your opponents, is changing the market for repair business. And logically, if there is less repair business than your opponent, who makes its money through the product and through the repair business, would be harmed financially. Well, a couple of responses to that. First off, Safe Flight didn't invent the dollar bill rule. It has been around far before Safe Flight. But it's using the dollar bill rule. Well, it is. And according to your opponent, the group of 16, including Safe Flight and them, decided that the long cracks could be repaired up to 14 inches. Right, but the record with respect to that, is that that up to 14 inches specifically stated, if you refuse to fix cracks longer than 6 inches, because Safe Flight does not believe a 7-inch crack is repairable, then you will not violate the Rolex. The testimony here is that to repair a crack, it has to be repeatable, durable, invisible, and provide customer service. And long cracks do not do that. You can tape a bumper to a car. You can inject resin into a crack. But it's not a repair. And most importantly, it's not a repair under the insurance policies. And it's the insurers who dictate, pursuant to their policies, because they want happy customers, that you cannot fix a long crack. Safe Flight guarantees that its repairs to windshields will pass all state safety inspections. Mr. Camfield testified in his deposition that the states of Maine and Connecticut will not pass an annual inspection on a car if there's a repaired long crack. So under Safe Flight's own guarantee, it cannot fix a long crack. But most importantly, again, it is an administrator for insurance company policies. The insurance company policies establish the dollar bill rule, not Safe Flight. I understand that Safe Flight operates in several capacities. One is its role with insurance companies. But another is it does direct repairs, correct? It does direct repairs by, as the third-party administrator, directing consumers to its shops. So you can't walk in off the street without insurance and say to Safe Flight, please fix my windshield? You can. You can. A consumer can walk in outside of the insurance concept and say, can you fix my windshield? That is correct. But in this case, there's no evidence at all of a consumer who would have used a long crack repair, having any kind of change in their consumer decision based on anything Safe Flight said. With respect to Mr. Canfield himself, where he says his own repair business, there's no evidence where Mr. Canfield said, I lost this customer because Safe Flight got in the way. The only evidence is in the McLean report that says Mr. Canfield operates in Grand Junction, Colorado, and Safe Flight operates in Grand Junction, Colorado. Competition is not proximate cause. You cannot presume damage just because you're a competitor. Lexmark made clear that you have to actually show harm. You actually have to establish harm. And in the cases in the Sixth Circuit and Lidochem that let a case go forward, there was a direct attack calling out the competitor. There's poison in your fertilizer. It said the fertilizer that has poison is yours. And then they presented, both on the commercial context, distributors who said, we will not distribute your product anymore. And then, in addition, a list of customers and consumers who said, we will not buy fertilizer from these distributors. So there was a showing of proximate cause. There was evidence of proximate cause. Here, there's none of that. You've got declarants who said, if maybe there might be demand, maybe I'd buy more. Let me ask you, I don't know if this is particularly relevant, maybe it is, but not just from, if you would pardon me, but does Safe Flight have a resin that could do the long repair that it manufactures? Or is this something proprietary to Ultrabond that does the long repair? Ultrabond just buys other people's resins. Okay. So this resin is available to both Safe Flight and Ultrabond to make long repairs if they want to make it? Absolutely. But again, Safe Flight cannot repair a long crack. It's not a repair. No more than taping your bumper back to your car is a repair by a body shop. It has been rejected for 35 years. Well, let's say a customer comes in to a Safe Flight auto repair place and you tell them the dollar rule and they say, well, I've heard from Ultrabond or other places that you can repair the long cracks and I'd like to have that done. What would Safe Flight do? Would it say, well, sorry, we just can't handle it, or would they go ahead and do the long repair? Yes, they'd say, we can't do that. Okay, so as a matter of policy, they will never do a to the position that Safe Flight took at an earlier time, as Mr. Campbell says? No, it is not. Safe Flight has never repaired long cracks, ever. I didn't ask you whether it did or not, but was it on a report that said it was acceptable to do long crack repairs and did it sign off on that as an appropriate means of fixing? Safe Flight was part of an industry committee that discussed what is an acceptable standard over a period of time consistently said no more than six inches. I thought Safe Flight signed on to the statement that long cracks up to 14 inches could be repaired. Right, and I'm trying to tell you. Sorry, we're interrupting you. So get to it. So they voted against anything more than six inches. Mr. Camfield threatened lawsuits and defamation cases against them, and they said, fine, if you want to fix a 14-inch repair, we will let that go in the rule as long as it is clear that those who will only do six inches are in compliance with that rule. So Safe Flight itself said never more than six for us. Well, you might have embroidered some on what's actually in the written document that's been referred to. You might have told us what you see as the fuller story, but that's not what we would derive from the documentation at the time, is it? Right, but no, that is in the record and in the depositions that that's how it unfolded, and then when that 14-inch rule went up to ANSI, which is kind of deliver it up to get the stamp on it, the committee voted to go back down to six inches and not have the 14-inch rule anymore, and then the Safe Flight representatives resigned. And after that fact, Mr. Camfield, in control of that committee, put it back up to 14 inches and submitted it. So at the time, Safe Flight – Why would Safe Flight resign if ANSI voted in their favor to reduce it to six? Because of Mr. Camfield's threats of defamation lawsuits and the like, and they thought the entire committee was dysfunctional, and so the two representatives from Safe Flight resigned and refused to go forward because the whole experience was dysfunctional. But Safe Flight was clear from the get-go, and again, in particular, when you say, wouldn't it be more profitable for them just to do replacements, Safe Flight's business is as a third-party administrator. That is its function, and its customers in that circumstance – Is that its primary business function? Yes, it's – Because I had the impression that it functioned in several different capacities. It does. As administrator for insurance companies and the administrator for 80 percent of the insurance companies out there, its customers are the insurance companies. And insurance companies, as is even stated in the briefs, love crack repair. So Safe Flight has more of a business incentive to keep its insurance customers satisfied by applying these policies that don't allow for a six-inch rule and then keep the end consumers satisfied by not repairing cracks that make people angry because they're visible and not durable and they crack out. But there is a big cost differential, I would assume, for a consumer who's not insured as between a repair versus a replacement, assuming that the repair works. For an uninsured consumer, yes, that's true. But we really have to get back, in this case, to proximate cause. With respect to that, there's no evidence in this record of any consumer anywhere who says, I don't have insurance and I walked into a Safe Flight shop and I wanted to fix a lawn crack and they told me I couldn't. And even in that circumstance, that's not even commercial advertising. That's a one-to-one business conversation. But in this case, we have to get back to proximate cause. This case has gone on for eight years, for four years, after spending 30 years attacking the entire industry and blaming other insurance companies and other TPAs. Mr. Camfield had over four years to produce evidence in this case of any kind that a consumer actually made a different choice based on advertising. Lexmark says, and Justice Scalia ends his opinion by saying, no matter what your relief, whether it's a literal falsity, whether you're asking for an injunction, as they were in Lexmark, you cannot proceed without proving and providing evidence of harm. And you can't do it with a consumer survey, which goes to deception, not harm. And you can't do it with a bunch of speculative declarations that don't even identify lost customers, but just say, hey, maybe if the world was different, I would buy more. Would it be enough if your opponent had found a customer who said that explicitly? Would that be enough to show proximate cause? If a customer pointed to an advertisement. There was an ad by Safe Flight that said you should replace your windshield if the crack is more than six inches. And therefore, I did the Safe Flight, but I really would have preferred to use the Ultrabond product at the Camfield facility. That would be a start. It would be at least a start. We don't have it in this case. And all of the declarants are in the insurance field, every single one of them. So you don't have the consumer who walked into the shop and provided that evidence. It is an excellent question, though. If you could find one person somewhere in Alaska, and Mr. Scott from Alaska, to be clear on the record, said he didn't know if he was the only person in that business in Alaska. He said specifically in his deposition that might not be the case. But if you could find one in Alaska of one customer somewhere, does that entitle under the Lanham Act a lawsuit to disgorge hundreds of millions of dollars of profits? I think the answer to that is no. Your red light has been on for a long time. Thank you very much. We'll hear the rebuttal. Thank you, Your Honor. I'd like to clear up a few misconceptions. First of all, the Rolag's committee, although Safe Flight post after this case tries to argue that it was dysfunctional, the fact is they voted unanimously, and that included Safe Flight. That 14 inches was the repairable standard. The idea that Mr. Canfield, strong-armed in Safe Flight, this behemoth company, would all of a sudden just roll over, and this is supported by Safe Flight's own internal documents. Their expert, Dale Irwin, wrote in an email that windshield cracks up to 24 inches are safe and durable. So there is no dispute. In fact, when Safe Flight began its attack on long-crack repair, they specifically said in an email shortly after the Rolag's were passed that the attack on long-crack repair should not be about safety, not an issue. Then they went to insurance companies, and this is another email, where the same individual, Paul Sifko, states, So far insurance companies have bought our uncertainty argument about long-crack repair. So this is revisionist history. With respect to Mr. Scott and his testimony, he specifically, I don't recall anything in the record, and certainly nothing is before the briefing, that Mr. Scott testified that he might not be the only vendor of long-crack repair in Alaska. So I don't believe that is anywhere in the briefing, and that is the testimony. It's also cited by Justin McLean, the expert report. So your opponent is saying that there's nobody who says, because of the advertising of Safe Flight, I did not get a long-crack repair. So one of the traditional methods to show deception, and this would go to Mr. Beeford's consumer survey with a but-for analysis, where he said 24 to 30.5 percent would choose long-crack repair but for Safe Flight's misstatements. Even in Lexmark, which dealt with Lexmark's printer cartridges and static control, which had a chip, there was not the issue. They didn't go to a consumer to say, oh, I was deceived by Lexmark's misrepresentation that the pre-bait was required to return by law and that static control's chip that was placed in there to prevent them from working misled me. This notion that you have to go to and bring a parade of consumers to the court to show evidence of proximate cause is found nowhere in any case. The traditional measure is an expert consumer survey. You see this, for example, in American Home, which was cited. And there, the Sixth Circuit ruled that the plaintiff did not show proximate cause because the survey went to a consumer, not to the home inspectors. And so it was kind of a disjointed survey, which was not applicable. But here, our survey does go to the end user of that product, so it's directly applicable. The other thing that the evidence shows in our brief is that Safe Flight admits they, the insurance companies, look to Safe Flight as the subject matter expert on what is repairable. Mr. Heron, the former CFO, said that. There's admissions where Safe Flight itself says we set the industry standard. All of this is in our brief. These are internal emails. So, again, it's not a policy. Insurance companies aren't determining what is safe. They're looking to Safe Flight because they are a behemoth. And Safe Flight is, as soon as the ROLAGs were passed, that's when the attack began. And it began because Safe Flight realized they were going to lose tremendous amounts of business because replacements are so far more profitable. And it does harm consumers because consumers, even if they're insurance clients, they pay a deductible. And so they are out of pocket for that deductible. And, in fact, there is an email in our opening brief from Mr. McMillan, a Safe Flight sales rep, to insurance companies where he says many customers would like long crack repair. This came out right in 2005, I believe, when the ROLAGs committee was meeting. Because it's a less expensive alternative. And, by the way, Mr. Camfield testified, and this is in his expert report, long crack repair is safe. It meets all federal standards. It's the same standard that applies in New Zealand, which is 14 inches, New Zealand and Australia. And, by the way, as Mr. McLean said, when Belron, which is Safe Flight's parent company, was forced to stop misleading consumers about the repairability length in New Zealand, which has the same 14-inch standard, Mr. Camfield's business went up 50 percent. As soon as that deception stopped. That's in Mr. McLean's report. And so that's evidence of direct harm. And, lastly, Mr. Scott testified absolutely that Safe Flight, his consumers who wanted long crack repair would talk to Safe Flight. They would be told that you can't do it or it's not safe. And he said it happened many times, and he lost that business. And that's a classic example of injury flowing directly within Lexmark's standard. Thank you. Thank you both for your argument. And the case will be submitted. Your Honor, I have the cite to the Mr. Scott's testimony where he said he might have to go to Alaska if he wanted that record. Well, we've got all of the testimony, so thank you very much. Thank you.